**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 04:27 PM September 17, 2014**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

|  |  |
|---|---|
| IN RE: | ) CHAPTER 7 |
|  | ) |
| HELEN WAY AND DAVID A. WAY, JR., | ) CASE NO. 12-60209 |
|  | ) |
|  | ) JUDGE RUSS KENDIG |
| Debtors. | ) |
|  | ) |
|  | ) **MEMORANDUM OF OPINION (NOT** |
|  | ) **INTENDED FOR PUBLICATION)** |
|  | ) |

The issue before the court is the extent to which oil and gas rights located below a debtor's property are protected by the Ohio homestead exemption. The court concludes that they are not, because the purpose of the exemption statute is the preservation of a decent home, but not the riches beneath it.

Anne Piero Silagy, the chapter 7 panel trustee ("Trustee"), filed a motion on March 21, 2014, seeking court authorization to sell Helen Way and David A. Way, Jr.'s ("Debtors") mineral rights to Gateway Royalty II, LLC ("Gateway"). On May 28, 2014, Debtors objected to Trustee's motion. In response, Debtors amended their schedules, making clear that their claimed homestead exemption applies to any mineral rights below their property. Trustee disagreed with Debtors' interpretation of the Ohio homestead exemption, and filed an objection on June 16, 2014. Debtors filed a response on June 30, 2014. The court conducted a telephonic status conference on June 26, 2014, where both parties agreed to a briefing schedule, and both parties have filed briefs in support of their respective positions. The following constitutes the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

1

The court has jurisdiction of this case under 28 U.S.C. § 1334 and the general order of reference dated April 4, 2012. In accordance with 28 U.S.C. § 1409, venue in this district and division is proper. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (M), (N).

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## Facts

Debtors purchased their current residence in Carrollton, Ohio via a single survivorship deed in 2000 (the "Carrollton Property"). While the entire property was purchased at one time, the land straddles Washington Township and Harrison Township, resulting in two different legal parcel identification numbers.[1]  The combined parcels have one mailing address and a single mortgage. The Harrison Township parcel ("Harrison Parcel") consists of 9.33 acres containing Debtors' residence. The Washington Township parcel ("Washington Parcel") consists of 1.69 acres containing a driveway connecting Debtors' residence to a public road, as well as utility lines. Debtors own 50% of the oil and gas rights associated with the Harrison Parcel (the other 50% interest was reserved by the land's previous owner), and 100% of the oil and gas rights on the smaller Washington Parcel.

Debtors filed for chapter 7 bankruptcy protection on January 31, 2012, claiming assets valued at $233,305.00, along with liabilities of $381,501.55. Schedule A, which lists Debtors' real property, includes the Carrollton Property with a value of $204,480.00, but did not originally reserve any interest in mineral rights. On June 8, 2014, Debtors amended Schedule A to claim a "[r]eservation of mineral, oil and gas rights" in the Carrollton Property. The June 8 revisions also updated Debtors' exemptions, claiming the Ohio homestead exemption protects mineral rights below the Carrollton Property.

Around October 21, 2010, well before Debtors filed their current bankruptcy petition, Debtors entered into an oil and gas lease with Ohio Buckeye Energy, LLC ("Buckeye Energy") covering the Harrison Parcel and Washington Parcel. The lease gave Buckeye Energy the exclusive right to "explore for, develop, produce, measure, and market production" of oil and gas withdrawn from Debtors' property (the "Buckeye Lease"). Debtors received $6,333.50 from the lease, but oil and gas drilling has not yet commenced. Debtors' bankruptcy petition lists the unexpired Buckeye Lease, but states that the lease will not be assumed under 11 U.S.C. § 365(p)(2). In addition to the Buckeye Lease, Trustee has an offer from Gateway which will pay the bankruptcy estate $2,500.00 per acre for an oil and gas deed covering Debtors' property, resulting in a proposed payment of $27,497.50 (the "Gateway Deed"). Trustee believes the Gateway Deed is fair, and filed a motion seeking court approval.

---

[1] The Washington Township parcel is identified by Tax Parcel Number 34-0000117.02 and the Harrison Township parcel is identified as Tax Parcel Number 15-00004571.015.

2

Debtors oppose the Gateway Deed, and make the following arguments: (1) the Carrollton Property mineral rights are not property of the bankruptcy estate; (2) the Carrollton Property mineral rights are protected by the Ohio homestead exemption; (3) oil and gas drilling would improperly limit Debtors' quiet enjoyment of the Carrollton Property and expose Debtors to undue liability; (4) the Gateway Deed is invalid because it violates terms of the associated mortgage; and (5) the Buckeye Lease is invalid. Trustee counters by arguing that the Ohio homestead exemption only allows Debtors to exempt one of their two legally identified parcels, and mineral rights, even those associated with the properly exempted parcel, are not protected by the homestead exemption. Debtor's quiet enjoyment and legal liability arguments also must fail, as Gateway has agreed not to enter Debtors' land for drilling and must comply with Ohio drilling laws and regulations. Finally, Trustee is able to enter into the Gateway Deed even if it violates the associated mortgage, as the holder of the mortgage never objected to the sale.

R.E. Gas Development, LLC ("Rex"), an oil and gas development company, is the current holder of the Buckeye Lease and also filed a brief in the case on July 22, 2014. Rex's brief seeks to protect their interest in the Buckeye Lease. Rex argues that the validity of the Buckeye Lease is not properly before the court, but if the court decides to rule on the issue, then Rex's interest in the Buckeye Lease should be maintained.

## Law & Analysis

A voluntary chapter 7 bankruptcy case begins when a debtor files a petition under § 301 of the United States Bankruptcy Code ("the Code"). 11 U.S.C. § 301. When the petition is filed a bankruptcy estate is created, which includes, subject to certain exceptions, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "This definition is unquestionably broad, its main purpose being to bring anything of value that the debtors have into the [bankruptcy] estate." Lyon v. Eiseman (In re Forbes), 372 B.R. 321, 330–31 (B.A.P. 6th Cir. 2007) (internal quotation marks omitted). For example, a pre-petition personal injury claim or a liquor license granted by the State are both property of the estate. Bavely v. United States (In re Terwilliger's Catering Plus, Inc.), 911 F.2d 1168, 1172 (6th Cir. 1990); In re Richendollar, 2007 WL 1039065, at *3 (Bankr. N.D. Ohio 2007). Even assets in which the debtor has an ownership interest, but not a possessory interest, are pulled into the bankruptcy estate. United States v. Whiting Pools, Inc., 462 U.S. 198, 204–05 (1983) (holding that property seized by a creditor prepetition nevertheless becomes property of the bankruptcy estate upon case commencement). Based on the above, Debtors' interest in oil and gas rights below their property become part of the bankruptcy estate upon case commencement. In re Cassetto, 475 B.R. 874, 878 (Bankr. N.D. Ohio 2012) ("[T]here is no question that the oil and gas rights constitute property of the [d]ebtor's bankruptcy estate, as encompassed within § 541(a)."). Once property enters the bankruptcy estate, the trustee is tasked with reducing the property to money in a manner consistent with "the best interests of parties in interest." 11 U.S.C. § 704(a)(1).

3

I.      **The Ohio Homestead Exemption Covers Both of Debtors' Parcels, but Does Not Cover Associated Oil and Gas Rights**

While the vast majority of a debtor's assets are brought into the bankruptcy estate by § 541(a)(1), a debtor is allowed to protect certain property via statutory exemptions. 11 U.S.C. § 522; O.R.C. § 2329.66. Exemption statutes create "safe harbors" withdrawing specific assets from the bankruptcy estate, allowing the debtor to maintain the property throughout the bankruptcy process. In re Karn, 2014 WL 3844829, at *2 (Bankr. N.D. Ohio 2014). "An exemption withdraws an interest from the bankruptcy estate, and consequently from the creditors, for the benefit of the debtors." Baumgart v. Alam (In re Alam), 359 B.R. 142, 146–47 (B.A.P. 6th Cir. 2006). The overarching policy justification for bankruptcy exemptions is "to ensure that debtors and their families have sufficient means to support themselves through difficult times without becoming a public charge." In re Wood, 459 B.R. 263, 269 (Bankr. S.D. Ohio 2011); In re Felgner, 2011 WL 5056994, at *2 (Bankr. N.D. Ohio 2011) ("Exemptions promote a variety of public-policy aims: (1) providing the debtor with that property which is necessary for their survival; (2) enabling the debtor to rehabilitate themselves; and (3) protecting the debtor's family from the adverse effects of impoverishment."). Without the homestead exemption, many debtors could be forced to sell their residence to satisfy creditors, potentially leaving the debtor homeless, shifting the costs of the debtor's care, at least temporarily, onto housing shelters or government programs, instead of creditors who were aware of nonpayment risks when extending credit. See In re Karn, 2014 WL 3844829, at *2. Based on the above considerations, Ohio courts have long been "[g]uided by the principal that exemptions are to be construed liberally in favor of debtors." In re Wood, 459 B.R. at 269 (internal quotation marks omitted); see also In re Wengerd, 453 B.R. 243, 246–47 (B.A.P. 6th Cir. 2011); Daugherty v. Cent. Trust Co. of Ne. Ohio, N.A., 504 N.E.2d 1100, 1103 (Ohio 1986); Sears v. Hanks, 14 Ohio St. 298, 301 (1863) ("[T]he [homestead] act should receive as liberal a construction as can be fairly given to it."). Therefore, when "it is possible to construe an exemption statute in ways that are both favorable and unfavorable to a debtor, then the favorable method should be chosen." In re Wood, 459 B.R. at 269 (internal quotation marks omitted).

While federal law normally supersedes inconsistent state laws, in a showing of deference to state rights, the Code allows each state to choose one of three exemption options: "(1) allow a debtor to elect the federal exemptions under § 522 of the Code; (2) allow a debtor to elect State law exemptions, which in Ohio are contained in O.R.C. § 2329.66; or (3) allow a debtor to choose between the federal or state exemptions." In re Karn, 2014 WL 3844829, at *2 (citing 11 U.S.C. § 522(b)). The Ohio Legislature choose the second option, only allowing debtors domiciled in Ohio to use the exemptions in the Ohio Revised Code. O.R.C. § 2329.662. The exemption central to the current dispute is the Ohio homestead exemption, which protects "one parcel or item of real or personal property that the [debtor] . . . uses as a residence." O.R.C. § 2329.66(A)(1)(b).

4

### A. The Washington Parcel and Harrison Parcel May Both Be Exempted Under the Ohio Homestead Exemption

Although Trustee has not raised the issue, the court must note that the current Ohio homestead exemption was not in effect on the petition date. House Bill 479, known as the Ohio Legacy Trust Act ("Trust Act") was signed by the Governor of Ohio on December 20, 2012 and became effective on March 27, 2013.[2] The Trust Act expanded the value of the Ohio homestead exemption from $22,200.00 to $125,000.00,[3] and also defined the previously undefined term "parcel" as "a tract of real property as identified on the records of the auditor of the county in which the real property is located." O.R.C. § 2329.66(A)(1)(b)–(c). Debtors filed their current bankruptcy petition on January 31, 2012, before the Trust Act's effective date.

While the court has been unable to locate any cases analyzing the Trust Act's changes, the court need not interpret the new statute. Section 522(b) of the Code allows a debtor to exempt property allowable under federal or state law "that is applicable on the date of the filing of the petition." 11 U.S.C. § 522(b). Similarly, the Ohio Revised Code states that exemptions should be determined as of the petition date. O.R.C. § 2329.66(D)(1). The United States Supreme Court, as well as bankruptcy courts within Ohio, have also consistently used the petition date to determine applicable exemptions. White v. Stump, 266 U.S. 310, 313 (1924); In re Wengerd, 453 B.R. at 250; In re Pursley, 2014 WL 293557, at *3 (Bankr. N.D. Ohio 2014). As Debtors' filed their bankruptcy petition on January 31, 2012, and the Trust Act became effective on March 27, 2013, the changes made by the Trust Act are not applicable. Moreover, interpretation issues would abound in a case such as the present one if the Trust Act applied, given that the parcel could not be given one number due to government line drawing.

### 1. Multiple Pieces of Land may Constitute "One Parcel" Under the Ohio Homestead Exemption

The Ohio homestead exemption allows for the protection of "one parcel or item of real or personal property that the [debtor] . . . uses as a residence." O.R.C. § 2329.66. Therefore, the court must decide, for purposes of the homestead exemption, the meaning of the term "parcel." Trustee argues that "parcel" should be defined as a single legal parcel as identified in the records of the State of Ohio. Debtors argue for a more expansive reading. When interpreting an Ohio statute, federal courts seek to give the statute the same meaning as would the Supreme Court of Ohio if posed with the same question. Burns Mortg. Co. v. Fried, 292 U.S. 487, 494 (1934); Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178, 1181 (6th Cir. 1999). The Supreme Court of Ohio seeks to give rise to a statute's legislative intent, and the first place to look in ascertaining intent is the statutory text. Carnes v. Kemp, 821 N.E.2d 180, 183 (Ohio 2004).

---

[2] Ohio Legacy Trust Act, H.B. 479, 130th Cong. (Ohio 2012), available at
http://www.legislature.state.oh.us/bills.cfm?ID=129_HB_479.
[3] The Ohio homestead exemption is indexed for inflation, creating the possibility that the current homestead exemption valuation may differ from the amount in the statute.

While the Supreme Court of Ohio has not defined "parcel" in the bankruptcy context, it did analyze the term in the property tax realm. Park Ridge Co. v. Franklin Cnty. Bd. of Revision, 504 N.E.2d 1116 (Ohio 1987). The Supreme Court of Ohio was analyzing a statute that required taxing authorities to determine the value of "each lot or parcel of real estate" in order to assess property taxes. Id. at 1119 (citing O.R.C. § 5713.01). The county auditor argued that the statute only referred to the permanent parcel numbers from the auditor's records. Id. The Supreme Court of Ohio rejected the argument, noting that:

> [n]umbered permanent parcels facilitate conveyancing and may serve other valuable purposes. However, there is no valid reason why their relatively arbitrary boundaries must always limit valuation practices for real property taxes. The true value for real property may well depend on its potential use as an economic unit. That unit may include multiple parcels, or it may be part of a larger parcel, on the auditor's records. The boundaries of that unit may change with time and circumstances. Thus, a separate tract for valuation purposes need not correspond with a numbered parcel.

Id. at 1120. Instead of giving "parcel" a narrow reading, the Supreme Court of Ohio focused on economics. Similarly, bankruptcy courts attempt to avoid economically nonsensical results, and instead interpret statutes in a manner consistent with statutory text and likely to give an accurate reflection of a debtor's financial situation. See In re Skiles, 504 B.R. 871, 880–81 (Bankr. N.D. Ohio 2014). At least two prior Supreme Court of Ohio decision have also approved aggregate valuations for real property consisting of multiple parcel numbers. Columbus Bd. of Educ. v. Fountain Square Ass'n, Ltd., 459 N.E.2d 894 (Ohio 1984); Youngstown Sheet & Tube Co. v. Mahoning Cnty. Bd. of Revision, 422 N.E.2d 846 (Ohio 1981).

While the Supreme Court of Ohio's decision in Park Ridge is not directly on point, the case is instructive. The definition for "parcel" from Park Ridge was expansive, including "property with a single owner, for which the highest and best use is a single unit," as long as the property is "in actual physical contact with each other." Park Ridge Co., 504 N.E.2d at 1120. The court agrees, holding that "parcel" under the Ohio homestead statute includes any land, regardless of legal identification numbers, as long as the land is contiguous and used by the debtor as a single residence. See In re Caperton, Case No. 10-31775 (Bankr. N.D. Ohio 2011); In re Miller, Case No. 10-30025 (Bankr. N.D. Ohio 2011). The court's definition is also consistent with the general bankruptcy policy that exemptions should be construed liberally in a debtor's favor. In re Wengerd, 453 B.R. at 246–47; In re Wood, 459 B.R. at 269. Additionally, a holding focusing on legal identification numbers, and not economic realities, could potentially lead to an absurd result when a debtor purchases two parcels and builds a home spanning both parcels. Would the homestead exemption cover the debtor's living room and kitchen on one parcel, but exclude his bedroom and bathroom on the other? See In re Miller, at p. 6. This type of nonsensical formalism arising from government line drawing has been the subject of sitcoms for decades. See, e.g., Petticoat Junction: A Borderline Story (CBS television broadcast Mar. 16, 1965). The humor points to the obvious, which is that common sense should prevail.

6

While each state's homestead exemption statute is slightly different, the court's expansive reading of "parcel" is also consistent with the overwhelming majority of states to consider the issue. See, e.g., Kwiecinski v. Cmty. First Nat'l Bank of Powell (In re Kwiecinski), 245 B.R. 672, 676–77 (B.A.P. 10th Cir. 2000); Fiffy v. Nickless (In re Fiffy), 293 B.R. 550, 555 (B.A.P. 1st Cir. 2003); In re Barksdale, 2014 WL 3611838, at *4 (Bankr. N.D.N.Y. 2014); In re Mead, 489 B.R. 363 (Bankr. D. Vt. 2013); In re Ford, 415 B.R. 51 (Bankr. N.D.N.Y. 2009); In re Edwards, 281 B.R. 439 (Bankr. D. Mass. 2002); In re Haseltine, 2007 WL 2932807, at *3 (Bankr. D.N.H. 2007).

## 2. Debtors Use the Washington Parcel and Harrison Parcel as One Residence

While a debtor is able to claim multiple legal parcels as a single homestead, the Ohio homestead exemption still requires that the debtor use the multiple parcels "as a residence." O.R.C. § 2329.66(A)(1)(b). Like the term "parcel," the Ohio homestead exemption does not define residence, and the court was unable to locate any Supreme Court of Ohio cases adopting a definition in the homestead context. Black's Law Dictionary defines a residence as "the place where one actually lives" or "[a] house or other fixed abode." Black's Law Dictionary, (9th ed. 2009) (Westlaw). Ohio Bankruptcy courts have defined "residence" as land "linked to the support, existence, or enhancement of the structure or for activities normally associated with a residence, such as family recreation." In re Caperton, at p. 8; In re Whitney, 459 B.R. 712, 715 (Bankr. N.D. Ohio 2011); In re Lusiak, 247 B.R. 699, 702 (Bankr. N.D. Ohio 2000) (residence "denotes occupancy of the premises by the debtor as a principal place of dwelling"). For example, in In re Miller, the debtor owned two contiguous pieces of property, one of which contained the debtor's home and the other contained a septic system. In re Miller, at p. 2–3. The court decided that the debtor used both tracts of land as part of his residence, as the septic system was sufficiently linked to the debtor's use of the other parcel as his primary dwelling. Id. at p. 6. However, in In re Caperton, a debtor could not include income producing real property within the homestead exemption. In re Caperton, at p. 8. While rental property may financially "support" a debtor, such an outcome is not the purpose of the homestead exemption. Id.

In the current case, Debtors own two pieces of land with separate government identification numbers. The Harrison Parcel contains Debtors' residence, while the Washington Parcel holds a driveway, which is the only way to access the residence, as well as utility lines. The improvements on the Washington Parcel are clearly "linked to the support, existence, or enhancement" of Debtors' homestead. Debtors use both legal parcels as a residence, allowing Debtors to claim the Ohio homestead exemption on both pieces of property, up to the statutory dollar limit.

7

### B. Debtors' Interest in Oil and Gas rights Below Their Homestead Does Not Qualify for Homestead Protection

While Debtors are able to combine the Washington Parcel and Harrison Parcel into one residence under the Ohio homestead exemption, whether the exemption applies to Debtors' interests in oil, gas, and other mineral rights located beneath the property is a separate inquiry. Trustee argues that oil and gas rights are not consistent with the statutory text or purpose of the exemption, as mineral rights do not contribute to a debtor's use of land as a residence. Debtors argue the opposite, basing their arguments on a portion of the Code that defines a "[d]ebtor's principal residence" as a "residential structure, including incidental property, without regard to whether the structure is attached to real property." 11 U.S.C. § 101(13A). Incidental property is subsequently defined as "all easements, rights, appurtenances, fixtures, rents, royalties, *mineral rights, oil or gas rights or profits*, water rights, escrow funds, or insurance proceeds." 11 U.S.C. § 101(27B) (emphasis added). However, the definitions from § 101 are applicable only to exemptions from the Code, not the exemptions adopted by the State of Ohio with statutory permission to deviate from the federal exemptions. 11 U.S.C. §§ 101, 522(b).

First, as noted above, oil and gas rights located below real property become part of the bankruptcy estate under § 541(a) at case commencement. In re Cassetto, 475 B.R. at 878. Mineral rights, which include oil and gas, are normally classified as real property while in the ground, but transform into personal property once brought to the surface. In re Loveday, 2012 WL 1565479, at *3–4 (Bankr. N.D. Ohio 2012); In re Cassetto, 475 B.R. at 878; see also In re Poer, 76 B.R. 98, 99 (Bankr. N.D. Tex. 1987). However, valuing mineral rights is often extremely difficult, as the exact quantity and location, as well as the costs of extraction, are extremely volatile. This uncertainty creates problems with fixed dollar value exemptions. In Ohio, two main valuation theories have developed, the "ownership in place" theory and the "nonownership" theory, both of which have been described by various courts as the "well established" Ohio position. In re Loveday, 2012 WL 1565479, at *2. The ownership in place theory holds that "the owner of a tract of land holds the fee in oil and gas underlying the boundaries of his property even though the oil and gas are not the subject of actual possession until brought to the surface." Id. (internal quotation marks omitted). In contrast, the nonownership theory "recognizes the migratory nature of oil and gas, [and] requires actual possession to establish ownership of the resource, and the right held by the landowners is the right to reduce the oil and gas to possession or to sever this right for economic consideration." Id. (internal quotation marks omitted)). The court, in In re Loveday, adopted the nonownership theory, reasoning as follows:

> Given the migratory nature of oil and gas, it is premature to give value to the oil and gas before they are extracted from the land. The varying price of oil and gas affects the exploration of real property for their existence and, therefore, to value real property to include the value of oil and gas is near impossible. Therefore, the value of the oil and gas cannot be determined to any degree until the oil and gas are extracted from the land or at least until an offer

8

> is made to a debtor to purchase the oil and gas rights to specific
> real property.

Id. When valuing mineral rights, "it is sensible that oil and gas are not valued until they are extracted from the real property," or a concrete offer, such as an oil and gas lease, has been made to purchase the rights. See id.

Only one Ohio court has analyzed the intersection of oil and gas rights with the homestead exemption. In re Cassetto, 475 B.R. 874. In In re Cassetto, the debtors owned a 15.50 acre homestead with significant oil and gas beneath it. Id. at 876–77. The debtors and BP American Production Company negotiated an oil and gas lease where the debtors would receive a $60,450.00 signing bonus, as well as a 17.5% royalty on the sale of the oil and gas derived from the debtor's land. 475 B.R. at 877–78. The trustee agreed to allow the debtor to keep future royalty payments, but argued that the signing bonus belonged to the estate. Id. at 877. In response, the debtors argued that the oil and gas rights were protected by the Ohio homestead exemption, making any signing bonus the debtor's property. Id.

The court first noted that oil and gas valuation uncertainties create a dilemma when applying statutory exemptions with specific dollar limits. Id. at 882. To solve the problem, the court in In re Cassetto adopted the nonownership theory, holding that oil and gas rights cannot be protected by the homestead exemption when their valuation is not reasonably certain. Id. at 883–84. Additionally, once oil and gas has been extracted, the assets are no longer real property, but are transformed into personal property that can no longer be protected by the homestead exemption.[4] Id. The court acknowledged that the result is difficult for debtors, as interests in oil and gas are not protected by the homestead exemption before valuation or after withdrawal. Id. at 884. However, the court concluded that the result was justified, as the "[h]omestead [e]xemption was not enacted to create a windfall for debtors to the detriment of creditors. The [h]omestead [e]xemption exists to allow a debtor to exempt the value of certain property so that the debtor and his/her dependents may have a place to live." Id. Instead, oil and gas is "unnecessary to enjoyment of the homestead by the debtor and production of oil and gas for profit is no more a homestead use than operation of any other business venture." Id. (citing Nazar v. Thexton (In re Thexton), 39 B.R. 367, 373–74 (Bankr. D. Kan. 1984)). The court then excluded the debtor's interest in the signing bonus from homestead protection. Id. at 884.

Debtors cite to a Kansas bankruptcy case for support of the opposing position, that oil and gas rights should be protected by the homestead exemption. In re Thexton, 39 B.R. 367. Unfortunately for Debtors, the Ohio and Kansas homestead exemptions are very different. The Kansas homestead exemption states that a married debtor cannot alienate a residence without the consent of both spouses, but if one spouse is judged to be insane, then a duly appointed guardian "may be authorized to join with the sane spouse . . . in executing a lease thereon authorizing the lessee to explore and produce therefrom oil, gas, coal, lead, zinc or other minerals." Kan. Const. Art. 15 § 9. Based on the specific reference to oil and gas in the Kansas Constitution, as well as

---

[4] The Ohio homestead exemption only protects property used as a residence, and barrels of oil do not qualify. O.R.C. § 2329.66(A)(1)(b)

case law interpreting the Kansas homestead exemption,[5] the court concluded oil and gas constitutes real property subject to the homestead exemption. In re Thexton, 39 B.R. at 373. The court expressed frustration over the outcome, noting that "[t]here is no justice in the legal fiction that an [oil and gas interest] is a real estate interest and part of the homestead." Id. However, "based on the existing statues and cases compromising the law [in Kansas], a legal fiction with a questionable purpose of justice at best is permitted, and in fact required, to prevail." Id. at 373–74. The Ohio exemption statute is very different than the Kansas exemption, and no decision binds the court to a specific outcome. Therefore, based on differences in statutes and case law, the court declines to adopt the reasoning and outcome from In re Thexton.[6]

The court agrees with the analysis of In re Cassetto, but the decision appears to leave a "sweet spot" where a homestead exemption in mineral rights remains possible. If a debtor's interests in oil and gas are valued by an oil and gas lease but have not yet been brought to the surface, the assets have a sufficiently concrete valuation but also remain classified as real property. This is the situation currently before the court. However, even though Debtors' oil and gas rights are real property with a reasonably specific valuation, the real property must nevertheless be "use[d] as a residence." O.R.C. § 2329.66(A)(1)(b). The residence test employed in Ohio is whether the property is "linked to the support, existence, or enhancement of the structure or for activities normally associated with a residence, such as family recreation." In re Caperton, at p. 8; see also In re Kimble, 344 B.R. 546, 555 (Bankr. S.D. Ohio 2006) (holding that the homestead exemption requires that property be occupied as if it were a home). First, the court notes that Debtors' interest in oil and gas has value, and therefore will support or enhance the value of the property. However, simply increasing the value of real property, or generating revenue that helps to support a debtor, is not sufficient to be considered part of a residence. Many courts have prohibited the protection of business interests under the homestead exemption. For example, in In re Caperton, the debtors owned two contiguous pieces of property, one containing a residence and the other being an open lot. In re Caperton, at p. 2. Every year the debtor leased the open lot to a farmer, but the debtor would still use the lot to walk his dog and ride ATVs. Id. at 8–9. The court concluded that because the primary use of the open lot was a business purpose, "the [d]ebtors do not use both the [open lot] and the [lot with the home] as a single unit as a residence." Id. at 9.

A number of states with homestead statutes requiring property to be used as a residence before qualifying for homestead protection have reached similar conclusions. For example, Florida's exemption limits a homestead within a city "to the residence of the owner or the owner's family." Florida Constitution, Art. X, § 4(a)(1). Florida bankruptcy courts have limited a

---

[5] The court reasoned by analogy, finding that prior Kansas case law allowing homestead protection in growing crops also applies to oil and gas interests. In re Thexton, 39 B.R. at 371.

[6] The court notes that other states (in addition to Kansas), allow a debtor to claim a homestead exemption in oil and gas rights located below a debtor's property. For example, in In re Graff, the court was applying the exemptions from the Code, which exempt a "debtor's principal residence," which includes "incidental property," which is defined to include any "oil or gas rights or profits" associated with the debtor's principal residence. 11 U.S.C. § 101(13A), (27B); Zabley v. Graff (In re Graff), 457 B.R. 429 (Bankr. W.D. Pa. 2011). However, as noted above, Ohio has opted out of the federal exemptions, making § 101 inapplicable in the current situation. The court was unable to locate any cases applying a statute similar to the Ohio homestead exemption to protect oil and gas rights.

residence to "that portion of the property which a debtor uses as his residence and cannot include any portion which is rented to and occupied by a third party or used by the third party as his own business." In re Nofsinger, 221 B.R. 1018, 1021 (Bankr. S.D. Fla. 1998). For example, in In re Wierschem, the court concluded that a debtor who owned a multi-unit apartment building and lived in one of the units could not apply the homestead exemption to the entire apartment, but instead only the unit the debtor actually occupied. 152 B.R. 345, 349 (Bankr. M.D. Fla. 1993). Similarly, the Maine homestead exemption protects the "real or personal property that the debtor . . . uses as a residence." 14 M.R.S.A. § 4422(1)(A). A Maine bankruptcy court determined that a debtor who owned a twenty-lot mobile home park, lived in a mobile home on one lot, and rented out the remaining nineteen lots, could only claim the homestead exemption in the mobile home and lot he lived on. In re MacLeod, 295 B.R. 1 (Bankr. D. Me. 2003). However, running a business in a residence does not automatically foreclose the homestead exemption, as a debtor that uses a single room within his residence to run a business often maintains the homestead exemption in the entire residence. In re Nelson, 225 B.R. 508, 509 (Bankr. S.D. Fla. 1998). The distinction is one of degree, with the distinguishing factors often being (1) how much of the property is dedicated to the business purpose and (2) if the business is conducted on a separate lot or structure from the primary residence. See id.[7]

The court finds cases excluding businesses from homestead protection analogous to oil and gas interests. Similar to business undertakings, the sale of oil and gas rights are not "activities normally associated with a residence." In re Caperton, at p. 8. While both oil and gas drilling and the operation of a business may generate income on the property, both are inconsistent with the purpose of the homestead exemption. In re Cassetto, 475 B.R. at 880–81; In re Thexton, 39 B.R. at 373–74 ("Certainly the royalties [from oil and gas] are unnecessary to enjoyment of the homestead by the debtor and production of oil and gas for profit is no more a homestead use than operation of any other business venture."). Additionally, if a homestead is sold a debtor receives a set amount of time to reinvest the proceeds into a new homestead before losing the exemption. However, with the sale of an oil and gas interest, a debtor could pocket the sale price and retain a residence that is essentially undiminished for residential purposes. The Ohio homestead exemption requires that the debtor use the property "as a residence," and oil and gas rights, even when classified as real property with a reasonably certain value, are not used as part of a debtor's residence.

## II.     The Gateway Deed does not Limit Debtor's Quiet Enjoyment or Expose Debtors to Environmental Concerns Sufficient to Prevent the Sale

Debtors make two related arguments: (1) the machinery, equipment, and activities associated with extracting oil and gas will substantially interfere with Debtors' quiet enjoyment of their homestead, and (2) the drilling activities may expose Debtors to significant legal liability. Specifically, Debtors argue that any drilling will interfere with their utilities, septic

---

[7] While some courts have allowed homestead exemptions in businesses located within separate structures, the associated homestead statutes have included specific references to business undertakings. See, e.g., Tex. Prop. Code. § 41.002(a) (stating that a homestead consists of property used as "an urban home or as both an urban home and a place to exercise a calling or business").

11

system, spring water well, along with many other aspects of their real estate. Debtors are also worried about other potential legal consequences from the oil and gas exploration, such as explosions, carbon dioxide emissions, groundwater contamination, oil and gas transportation, and earthquakes. Trustee counters by arguing that Debtors' fears are misplaced, as Gateway has agreed not to enter Debtors' land, and government regulations mandate oil and gas drilling safety protocols. Additionally, Trustee notes that Debtors previously entered into the Buckeye Lease, suggesting Debtors' current concerns are not related to future drilling, but instead are an attempt to maintain property in excess of that allowed by bankruptcy law.

The court was unable to locate any cases, and Debtors have not brought any to the court's attention, that stand for the proposition that oil and gas drilling sufficiently harms a debtor's quiet use and enjoyment of a homestead to prevent drilling. In support of their positions, Debtors reference the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), various Environmental Protection Agency guidelines, as well as mortgage company policies, but do not cite any cases linking the statutes and guidelines to bankruptcy cases. Debtors also previously entered into the Buckeye Lease, calling into doubt the sincerity of Debtors current quiet enjoyment objection. Trustee and Gateway have also agreed to include a clause in the Gateway Deed stating that drilling operations "shall not have the right to enter upon, or make use of, the surface of [Debtors' homestead] for any purpose whatsoever. [Oil and gas drillers] may only access the oil and gas underlying [Debtors' homestead] by directional or horizontal drilling emanating from a well site location which is not located on [Debtors' homestead]." (Trustee's Mem. in Supp. Of Trustee's Mot. for an Order Authorizing the Trustee to Enter into and Consummate Agreement for Oil and Gas Mineral Deed, and in Supp. of Trustee's Objection to Debtors' Homestead Exemption 6, July, 25, 2014, ECF No. 116). The combination of a lack of legal support, as well as additional language in the Gateway Deed limiting future disruptions, convince the court that Debtors' quiet enjoyment argument must fail.

Debtors are also concerned about potential environmental damage and future liability. However, oil and gas drilling is heavily regulated by the State of Ohio. In re Cassetto, 475 B.R. at 879. For example, state law requires the "restoration and reclamation" of land after the completion of exploration and production of oil and gas. Id. Therefore, any damage to Debtors' property will be fixed by the drilling company, and if damage does occur that is not properly remedied, Debtors will likely have a legal cause of action. Additionally, the laws and regulations Debtors cite in opposition to any drilling activities will be followed by any drilling company. While there is a great deal of concern accompanying the rapid expansion of drilling in Eastern Ohio, it is a legal, regulated activity. The court cannot interpose itself as some superior authority to bless or deny legal activities based on the court's whims or feelings. Many legal activities involve the possibility of serious physical injury and/or property damage. For example, 21,253 people died in automobile related accidents in 2011,[8] but the court does not restrict automobile transfers. Courts do not get to pick and choose which legal activities to allow and which to restrict. The court rejects Debtors environmental and legal concerns as legally unrecognized.

---

[8] U.S. Dep't of Transp., Nat'l Highway Traffic Safety Admin., Traffic Safety Facts: 2011 Data 1 (2013), available at www-nrd.nhtsa.dot.gov/Pubs/811729.pdf.

12

The debtors in In re Cassetto raised arguments very similar to those in the current case. The court rejected the arguments, noting the debtors "offer no support for the proposition that the alleged impairment in use and enjoyment and/or diminution in value of the [r]eal [e]state is sufficient reason to prohibit [t]rustee from maximizing the value of the bankruptcy estate. The [d]ebtors also offer no support for their assertion that they have a right to a homestead that is free from noise of machinery associated with oil and gas drilling, which may occur if [an oil and gas lease] becomes effective." Id. at 878. Trustee's proposed lease prohibits the wellhead and additional items from being located on Debtors' property. Thus, Debtors have not established that the wellhead will be any closer to their residence after the Gateway Deed than if their property is never sold. The court agrees with In re Cassetto, and similarly holds that general quiet enjoyment, environmental, and liability concerns are insufficient to prevent a Trustee from selling oil and gas rights in an effort to maximize the value of the bankruptcy estate.

### III.    Even if the Gateway Deed Violates Debtors' Mortgage, the Court may Nevertheless Authorize the Sale

Once § 541(a)(1) brings a debtor's property into the bankruptcy estate, the trustee "stands in the shoes of the [debtor]," meaning a trustee's interest "does not ordinarily extend beyond [the debtor's] prepetition interests." In re Liber, 2012 WL 1835164, at *3 (Bankr. N.D. Ohio 2012); Schwab v. Hahn, Loeser & Parks, LLP (In re SII Liquidation Co.), 2012 WL 4327055, at *7 (Bankr. N.D. Ohio 2012). Based on this rule, Debtors argue Trustee is unable to enter into the Gateway Deed because the sale violates the following terms of Debtors' mortgage: (1) the requirement to maintain property insurance; (2) the requirement to preserve and maintain the property; and (3) the requirement that hazardous materials not be used or stored on the property. Trustee counters by arguing that she seeks to sell the oil and gas rights under Debtors' land, not the actual residence covered by the mortgage. OneWest Bank, the holder of Debtors' mortgage, has not filed an objection to the proposed Gateway Deed. The court initially notes that it is unclear whether the Gateway Deed violates any terms of Debtors' mortgage, but for purposes of the ensuing analysis, the court will assume a violation.

The Code gives a chapter 7 trustee the authority to sell real property of the bankruptcy estate "after notice and a hearing." 11 U.S.C. § 363(b)(1). When the Code uses the phrase "notice and a hearing," a physical hearing is only necessary when "appropriate in the particular circumstances." Id. § 102(1)(A). The Code then gives additional guidance, noting that a hearing is only required if "requested timely by a party in interest." Id. § 102(1)(B)(i). In the current case, the holder of Debtors' mortgage was given notice of Trustee's motion seeking court permission to enter into the Gateway Deed, but did not file an objection. Section 363(f) of the Code allows a trustee to "sell property . . . free and clear of any interest in such property of an entity other than the estate, only if . . . such entity consents." Id. § 363(f)(2). In the current case, § 363(f)(2) gives Trustee the ability to sell Debtors' oil and gas rights free and clear of any violation of a mortgage term with proper consent. The issue is the limit of "consent," and if silence is a sufficient.

13

Courts are split on the issue of implied consent within § 362(f). For example, in In re Shary, a party purchased a liquor license at a bankruptcy sale. 152 B.R. 724 (Bankr. N.D. Ohio 1993). The State of Ohio resisted the transfer of the liquor license, arguing that it had a security interest in the license relating to unpaid tax obligations. Id. at 725. The court rejected the State of Ohio's argument, stating that any security interest was lost at the time of the sale, as "the State's failure to object to the sale . . . implicitly conveyed its consent to the sale as found under § 362(f)(2)." Id.; see also Veltman v. Whetzal, 93 F.3d 517 (8th Cir. 1996); Wilhoite v. Lemah (In re Wilhoite), 2014 WL 1922846, at *11 n.10 (Bankr. M.D. Tenn. 2014); In re AmTrust Fin. Corp., 2010 WL 4917557, at *2 (Bankr. N.D. Ohio 2010) (noting that "the holders of [l]iens that did not object or who withdrew their objection to the [sale] are deemed to have consented"); In re Sigma OH Indus., Inc., 2010 WL 4917558, at *3 (Bankr. N.D. Ohio 2010); In re Michael Day Enters., Inc., 2010 WL 4917608 at *3 (Bankr. N.D. Ohio 2010). However, in In re Roberts, a Michigan bankruptcy court concluded that implied consent is not sufficient under § 363(f), as "consent" and a "failure to object" are completely separate ideas. 249 B.R. 152, 155 (Bankr. W.D. Mich. 2000). The term "consent" is defined as "to give assent or approval," and silence cannot constitute the active approval required. Id. While there is no controlling Sixth Circuit precedent, the majority position allows the lack of an objection to constitute implied consent. 3 Collier on Bankruptcy, ¶ 363.06[3] (Alan N. Resnick & Henry J. Sommers eds., 16th ed. 2013); In re Roberts, 249 B.R. at 157.

The court agrees with the majority position, holding that silence constitutes implied consent that is normally sufficient under § 363(f)(2). When adopting the Code, Congress attempted to streamline the bankruptcy process, adopting a system eliminating many inefficient and unnecessary hearings, yet still giving parties the chance to be heard on important issues. 11 U.S.C. § 102(1); In re Roberts, 249 B.R. at 155; 3 Collier on Bankruptcy, ¶ 363.02[1][e]. This balance is manifested in the definition of "notice and a hearing," which only requires a hearing if a party specifically requests one. 11 U.S.C. § 102(1). The statute evidences Congressional intent to place the burden of objecting to a motion on the party opposed to that motion, assuming proper notice.[9] Requiring hearings on all proposed §363(f) sales, especially when an objection has not been filed, runs counter to the Code's efficiency goals. However, when engaging in a sale pursuant to § 363(f)(2) that would extinguish a significant monetary interest, a court may desire to obtain active approval from a creditor, seeking to balance debtor and creditor interests. See In re Pigg, 453 B.R. 728, 736 (Bankr. M.D. Tenn. 2011) ("In this case, the court finds that the [creditors] have consented to the sale by their inaction" because "equity demands that the court fashion a remedy that balances the rights of the lienholders and the right of a debtor to a fresh start"). In the current case, any interests eliminated by the Gateway Deed are relatively minor. The creditor maintains its lien on the surface of the property, as well as any structure and fixtures, which was likely the creditor's intent when entering into the mortgage. Under these facts, the court finds that the creditor's lack of an objection to Trustee's proposed sale of oil and gas rights constitutes consent within the meaning of § 363(f)(2).

---

[9] Placing the burden on the objecting party is not unique to bankruptcy law, as the Federal Rules of Civil Procedure, after proper service, require a defendant to respond to a complaint within thirty days or risk default judgment. F.R.C.P. 7012, 7055.

#### IV.     The Validity of the Buckeye Lease is Not Properly Before the Court

Debtors' raise a number of issues surrounding the Buckeye Lease. Debtors first argue the lease is invalid because it violates the terms of their mortgage, lending support to the argument that the Gateway Deed is also invalid. However, as noted above, the court finds that the mortgage holder has consented to the Gateway Deed. As the court's decision rests on implied consent, the validity of the Buckeye Lease is irrelevant to the validity of the Gateway Deed. Debtors also argue that Trustee did not properly accept the Buckeye Lease under § 365(d)(1), resulting in the lease's rejection. Similarly, the validity of the Buckeye Lease has no bearing on the two motions currently before the court: Trustee's objection to Debtors' Homestead exemption and Trustee's Motion to enter into the Gateway Deed. While the existence (not the validity) of the Buckeye Lease may shed light on Debtors' true intentions when raising quiet enjoyment and legal liability arguments, the Buckeye Lease is otherwise irrelevant to the court's approval of the Gateway Deed.

The court also notes that the validity of the Buckeye Lease is between Gateway and Rex (the current holder of the Buckeye Lease), not the court on a motion to approve the Gateway Deed. Additionally, Trustee admits to service defects with Buckeye Energy and Rex, further dissuading the court from deciding the issue at this time. The holder of the other 50% interest in the oil and gas rights associated with the Harrison Parcel also did not receive proper notice. The legal brief submitted by Rex also suggests that an out-of-court agreement may be reached between Gateway and Rex on the validity of the Buckeye Leases, further reducing the current need for court involvement. Gateway is willing to buy what Trustee is selling, and knows of the existence of the Buckeye Lease issues.

#### Conclusion

Based on the above, the court finds that Debtors' two legal parcels constitute one "parcel" under the Ohio homestead exemption. However, the Ohio homestead exemption does not protect Debtors' interests in oil and gas located below their property. Any oil and gas drilling under the Gateway Deed will not sufficiently harm Debtors' quiet enjoyment of the property or expose Debtors to undue environmental litigation. The court also finds that the holder of Debtors' mortgage consented to Trustee's proposed sale via a failure to object, allowing Trustee to enter into the Gateway Deed notwithstanding any contrary mortgage language. Finally, issues pertaining to the validity of the Buckeye Lease are not properly before the court.

Therefore, Trustee's Motion for an Order Authorizing the Trustee to Enter into and Consummate Agreement for Oil and Gas Mineral Deed and Trustee's Objection to Debtors' Homestead Exemption are **GRANTED**. An order will be entered simultaneously with this opinion.

It is so ordered.

#        #        #

**Service List**:

**Helen Way & David A Way, Jr.**
4179 Lunar Road
Carrollton, OH 44615

**Kathleen Donnelly**
526 Superior Ave.
#1030
Cleveland, OH 44114

**Anne Piero Silagy, Esq**
Canton
1225 South Main St
Suite 1
North Canton, OH 44720

**Roger J. Stevenson**
Roetzel & Andress
222 South Main Street
Suite 400
Akron, OH 44308

**Robert A. Bell, Jr.**
Vorys, Sater, Seymore and Pease LLP
52 E. Gay St.
P.O. Box 1008
Columbus, Ohio 43216